Our fourth case this morning is Rubman v. USCIS, case number 14-3733. The H-1B visa for professionals and the H-1B visa cap are some of the most debated immigration issues in the country. This case is about piercing the secrecy of how USCIS administers the H-1B cap. The FOIA is designed to encourage disclosure of how the government administers programs such as these, but the government is not honoring that purpose here. Mr. Rubman sought all documents regarding statistics on approvals and denials of H-1B cap subject petitions during the fiscal years 2009-2012. The government did not provide him with any actual documents from their records on this subject. Instead, they have created a chart summarizing the information that Mr. Rubman asked for. The district court erred in finding such a response by the government acceptable. A summary in lieu of the actual documents sought is not acceptable because the requester has no way to verify that the summary accurately characterizes the documents he was actually seeking because he can't see those documents. The government claims, or appears to claim, that they're providing the summary because the alternative would be providing Mr. Rubman with nothing because they seem to be claiming they don't actually have any documents responsive to his request. That does not make any sense. I don't know. I didn't really see that in the response, that there are no documents. There was a reference to nothing else that might be useful to him or might be helpful to him in his inquiry, but not a denial that there are no further responsive documents. The appeal, the administrative appeal, sort of assumed that the response, the FOIA request was responded to in full, but that goes beyond what the FOIA response actually said, it seems to me. Well, I mean, I would admit it's a little ambiguous, Your Honor. I feel that there are some places in the government's appellate brief where they appear to be saying they created the chart because they were trying to be helpful and give Mr. Rubman something, but I also agree that there are also places where they appear to be arguing that they've simply given him everything that's responsive to his request. If you construe the request on its face as asking for documents related to these statistics, then that's a wholly incredible statement for the government to be taking. Yeah, I mean, I don't believe it's credible either. I mean, I think that they've not fully responded to his request. His request was for all documents regarding statistics. They've given him one chart, and I think they've admitted in the record that there's actually more information besides this chart that exists. There's a letter from Ms. Eggleston, the USCIS's FOIA officer, in which she says that she's not going to provide Mr. Rubman with things like emails or reports on H-1B statistics because those would just create confusion. That's not an acceptable reason for withholding documents under the FOIA or for refusing to search for them. So I think the crux of Mr. Rubman's argument here is that they've just interpreted his request unreasonably narrowly. They seem to view his request as just a request for a chart that lists the statistics for the years that he named in his request. He asked for all documents reflecting statistics. I mean, that can include many other things. It could include the agency's discussion of the statistics during those years, and in terms of how they were doing in terms of meeting their obligation to fill the cap. One of the things that the agency has to do is look back at prior years and see how they did in those prior years. How many were they approving? How many were they denying? So they can come up with some calculation of how many petitions they need to accept  because if they were only to accept 85,000, they're not going to fill the cap based on that because a certain percentage are going to be denied or withdrawn. So I mean... Right. It's my understanding the way this program works is every year they look at their historical data for how the cap is hit every year, and then they adjust the timeframe for which they'll leave the application window open accordingly, basically. I mean, I think what is a little bit unclear, I mean, we know for certain that they look at how many petitions they receive on the first day that the filing period opens, and then they make some sort of decision about whether they can keep the period open for And at certain periods, you know, they'll announce that it's still open or that it's closing based on how many they've received. I mean, what we don't really know is, you know, what is the number that they think they can receive before they have to close the cap. They don't say that anywhere. They don't announce that publicly. Now, it may be that this request is too broad, and there might be an objection lodged on the basis of it being unduly burdensome, but it's my understanding that that wasn't really litigated in this case, and that objection, or there was no exemption or objection claimed on that basis? I mean, I think that, you know, they made some arguments about it being unduly burdensome to produce broad data to Mr. Rudman. I don't see that argument anywhere with respect to other things, like communications about the statistics. And it's my understanding that you're not asking for the raw data, or is that still on the table as within the scope of this FOIA request? I mean, we've conceded we're not asking for the raw data anymore. We're asking for other things that would be responsive to his request for all documents regarding statistics. I don't believe that the government has answered that request fully. I mean, they may claim that the request was too broad. My view on that is that if that was their feeling, the FOIA regulations require them to consult with Mr. Rudman and speak to him and ask him to narrow his request or be a little bit more clear about what he's seeking. And that hasn't really been done either. They just unilaterally decided the chart was the easiest way to respond and that that's what they were going to give him. So to be clear, it's my understanding that your client is no longer looking for raw data as a response to this request, even though it was probably within the scope of the request, which is phrased very broadly and has accepted the latest of the charts that the government has provided in lieu of raw data, but you're looking for all other forms of documents. Well, I wouldn't exactly say he's accepted the latest chart. I mean, he has various problems with the latest chart. All I would say is that what we're looking for is not, at this point, isn't really the that. It's communications within the agency about the statistics. And I haven't seen any argument from them that it would be unduly burdensome to produce those things. Can you tell me how communications about the raw data is included in your request? Well, it asks for all documents reflecting statistics. And so, in our view, a document reflecting statistics, that would include documents that the agency, written communications within the agency, whether they be emails, memos, maybe perhaps written reports that they created, in which they're discussing the H-1B statistics in those relevant years. I mean, they have to have some discussions amongst themselves about the statistics in make these calculations that the regulations require them to make. There has to be some discussion, you know, this is how we did last year. And based on that, that's our plan. Here's our plan for how we're going to handle it this year. So why didn't you specify in that request that you wanted the emails, that you wanted the monthly statistics? I mean, I... You've got a shotgun approach, and then you narrowed it down later. It's kind of a moving target, as I see it. Well, I don't agree with that, Your Honor. I mean, I would agree that Mr. Rubbin's initial request was broad. But I also think that, you know, Mr. Rubbin's view is that he wasn't sure what was out there. He didn't really know exactly what they had. He wanted the request to be broad, to capture as much as was possible. But if the government feels that it was too broad to reasonably search, then the regulations require them to go to him and ask him to narrow it down a little bit, to help them out. And that wasn't done. They just decided themselves how they were going to narrow it. So... So, I mean, again, I would say, just repeat, that we don't believe it was reasonable for the government to interpret Mr. Rubbin's request as being only for the raw statistics themselves, as opposed to other things. The government is claiming now, in this litigation, that his request for all documents regarding statistics was too broad and ambiguous for it to respond, because he didn't explain what he meant by documents. But, again, if he was unsure about that, the regulations required them to go to him and clarify. The district court's decision, in our view, allows the government too much leeway to narrow the scope of a FOIA request, and allowing the agency to reasonably interpret a request for documents does not mean they can just unilaterally decide to provide a summary instead of the actual documents that are sought. Additionally, as a matter of common sense, I would point out that it's been clear since October 2012 exactly what Mr. Rubbin wants. The government is not really arguing that point. They just claim that they're justified in ignoring his October 2012 letter, because FOIA requesters should not be allowed to affirmatively clarify their requests. The government and the district court have not given any good reason as to why this should be the rule, especially when you consider that the FOIA regulations themselves encourage and even require the government to seek clarification in some circumstances. One of the things they've claimed is that allowing the requesters to do this would make endless open-ended requests, but the FOIA already allows a requester to make multiple requests. The only requirements for a FOIA request are that it be in writing, and that it identify the documents sought with enough specificity for the government to search for them. When Mr. Rubbin communicated with the government in October 2012, his letter in which he said that he wanted emails and reports, that meant both of those requirements. It was a request in writing for specific documents, and the government does not claim that that request was confusing. Another reason they give for justifying their decision to ignore this request is that if you let people clarify their requests after the fact, that would let requesters jump the There's really nothing that prevents the government from looking at a particular request or a clarification, deciding it should really be treated as a new request and moving it to the back of the line. So there's really no point at this time in having Mr. Rubbin do a new FOIA request for this information. It wouldn't say anything differently than what he's already told the government in October 2012, other than just specifying that this is a new request. And that, I would propose, is an overly formalistic approach that FOIA is not designed to encourage. So unless there are any more questions, I'll save the rest of my time for a bottle. Thank you. Mr. Oswald. May it please the Court, Counsel, I am Craig Oswald, an Assistant United States Attorney here in Chicago, representing United States Citizenship and Immigration Services. Your Honors, if the CIS made a mistake in this case, it was that they did more than they had to do. Mr. Rubbin's initial FOIA request is very specifically tailored towards a request for statistics. It delineated four years that it wanted statistics. It listed four different categories that they wanted. They wanted applications received, the number approved, the number denied, and the number withdrawn. And then he defined the terms. I want CAP subject information. These are all extremely specific things. Now, obviously, immigration has statistics. They file reports on this all the time. There's a website. This is a very hotly contested program. This is as transparent as anything I've seen. There's a website that is posted on these things. It's a very hotly done thing. Even this month, this month, the processing opened for jobs that would be filled on October 1st of this year. They had within the regulations require them, it's not done on a daily basis. They have to, under the regulations, keep the period open for five days. So that started on April 1st. Within the first five business days, they had 233,000 applications for the 85,000 petitions. This is all done immediately. There has not been, for a number of years, any problem in terms of that it is an oversubscribed category and they will, it's a very competitive thing and now, according to the regulations, a lottery will be done. But these statistics, in terms of the way that they're all broken down, and I understood Mr. Rubman's issues with trying to get these numbers to balance, that he was looking at that in terms of an academic thing. He made a request for these statistics broken down that way. Now does the government have to, in a FOIA case, create a document? No, it doesn't. They didn't have the statistics compiled already the way that Mr. Rubman wanted them compiled. The answer to his request would be, no, we don't have that document. We don't have to create a document. But this is not, because I believe it is a different immigration set of circumstances, they are very responsive.  The request on its face doesn't just request statistics. It requests all documents reflecting statistics regarding these fiscal years in the request and all documents which will show whether USCIS is complying with the statutory mandate, which arguably is an overbroad way of requesting these documents, but that objection has not been litigated here. So, clearly it's not just a FOIA request asking for the statistics. It does say all... You're suggesting that the statistics are posted on the website anyway and are publicly available through that avenue, so it can't reasonably be interpreted as asking for that data. There's a website. All of this stuff is reported on an ad immediately. Right, so it can't be reasonable to interpret this FOIA request to be asking for what's already publicly available on the agency's website. That's correct. That's a patently unreasonable interpretation of the request if what you say of the website is true. So it has to be requesting something beyond what's available on the website. What it requests, Your Honor, is the information be broken down in different ways. If you look at... In the brief, we've broken them down into data sets. And what happens here is Mr. Rubman wanted... So let's say that there are 233,000 applications filed in this filing period. He wanted something that broke them down. The way CIS had the statistics that were already generated, that were already available, was they would sometimes mix fiscal years. So let's say they would say all the documents that were filed in... If you look at the September 12th set of statistics, that's data set number one in our brief. It didn't add up to 233,000, for example. The numbers were more because there would be applications that would be filed in fiscal year 2013, and they might not be adjudicated until 2014. So he wanted something to say, I want to look at these statistics in the way that I want them set forth. And that's why he set this out. In a very specific way, with very specific criteria, in terms of saying that he wanted statistics. He also had previously done this with the agency, Your Honor. He had previously, in the filings and in the briefs, there was a set of statistics that he asked for and received in January of 2012, pursuant to a FOIA request. The same thing, that he was looking for statistical information on this. And then when we made a response to him, and we gave him the response in September, he said, this response doesn't add... The numbers don't add up. For example, they didn't add to the... If we would say it's 233,000, it doesn't account for the 233,000. I want it broken down that way. He didn't, Your Honor, say, where are my emails? Where are my documents? Where is this information? That was never brought up in terms of getting back to the agency. He merely said, rerun your data set and provide me with a corrected response. That's what they did. They came back, and that's where the October data came from. They gave it to him, Your Honor. They turned around in 11 days, and they also apologized to him. I can't get that service from the agency. In terms of doing what they have in terms of responding to this, it's extremely responsive. It was something that he wasn't really entitled to, per se. They could say, here are all the documents. Now, we go to this raw data issue that you brought up, Your Honor. This is not part of the record that was before Judge Koukouras. But you can see from the docket sheet that we had several times that we met with a magistrate judge in terms of settlement. The issue of raw data was explored because, frankly, I have dealt with Mr. Rubment over 30 years we've known each other. In terms of dealing with him and going back and forth, I know that he's a very respected practitioner. He's somebody who knows what he's talking about. When he says numbers don't match, I give him a lot of credit for that. I would be skeptical. I went to the client, and I said, do these numbers match? And then we went through this whole thing. And I realized, really, one way, the only way to really satisfy Mr. Rubment was going to be if we could give him the raw data that he could run himself. Well, now, if you go back to the raw data, all the raw data contains tax information. It contains Social Security numbers. It contains birth dates. For us to run it, not a huge problem. It's in a database that the government can run. If we were going to do that, we would have to scrub all of those records individually. And that's one reason why it's not, I mean, I think Mr. Rubment, with counsel, is not contending that he really wants the raw data anymore, because he knows that's going to cost a heck of a lot of money, take thousands of hours, probably, in terms of trying to do this over the four-year period. We had talked about doing it for one year and see if that was plausible. It didn't turn out to be plausible. Therefore, it was not something that could be done. And that's really what, when he talked about, your honor referred to this, well, it was said it was being confusing. Mr. Rubment is entitled to ask for those, you know, for the emails. I found out yesterday that there has been a subsequent, there's been some subsequent things that he's requested on some of these things in terms of a new FOIA. He can ask for whatever he wants, and that's what we've said, is basically, he can file a new FOIA request. It doesn't cost anything, but if we continue to go and we say, well, we're going to continue to go back and forth, when the request didn't have a specific response, we gave you the documents, the statistics that you wanted. Why were those documents not encompassed within his original request? The emails and the... And any other documents reflecting statistics about these years and this visa program. Because I think that the request was specifically tailored to those statistics. It was documents reflecting statistics. Well, it doesn't say, it didn't say, it didn't define a term as emails. The term email in these first two letters that are from Mr. Rudman is nowhere to be found. It's documents reflecting statistics. He didn't define documents. He's a respected practitioner, and he could have defined documents in a way that we do all the time. That's not required in a FOIA request. I would say that it's not... It's something that somebody who knows, who's had a course of conduct with the agency, and who has done that... There isn't a different standard for law professors. Well, you know, I don't say that... I would say that in terms of... Exactly, for all documents reflecting statistics, all documents which will show whether USCIS is complying with the statutory mandate of this visa program. And then in the follow-up correspondence, it's made even more clear, in particular the last one, that he is requesting all documents related to... But, Your Honor, it's not until that last one that he brought any notion of this up to them whatsoever. Well, it's implicit, in fact explicit, in the four corners of the original request, because it requests all documents. It doesn't just say, give me the statistics. It says documents reflecting statistics. If there were not documents reflecting statistics broken down... And to be clear about my request, I am seeking documents which will show whether USCIS is complying with the statutory mandate. Now, again, there might be an issue of over-breath there, an undue burden, but that's not what we're talking about. We're talking about whether there was a reasonable search made in response to this very large request. And the response was this single chart that got the numbers wrong. The district court found... Well, the numbers were not wrong. The numbers were run on one occasion, and it wasn't done to his satisfaction. He then sent them back a letter and said, can you rerun your statistics? This is not the way that I set forth in my request. They did that. They responded to it. Then when the chart came back, and he had the chart, it wasn't, to begin with, that the letter that we're talking about then is the letter that he sent in... It was on October 22nd, when he went through and he said, these numbers don't match. These numbers cannot be statistically reconciled. And when they went back and said, we have these numbers. These are the numbers that you are asking for. These are the numbers. And he had previously been given a set of statistics earlier. And then he went through the whole thing, and he says, these numbers don't match. And they said, basically, you're comparing different data sets. If you compare, for example, this fiscal year issue, some of them combined fiscal years in terms of what he... And he was comparing those rates in terms of denial rates. Some of them included revocations. If you look at his brief, he said he couldn't defend this... This one didn't match... Data set one didn't match data set two in what we had. He's dropped that in his brief because he says, well, you know, I guess I didn't consider that they didn't include revocations in one and not in another. They tried to meet what he was dealing with in terms of trying to meet this, and certainly to meet their obligation to say that we are giving out this number of visas and no more. And they gave him the accurate statistics that he had, and that came back when they did that on October the 12th. In terms of some kind of a standard that we have here in terms of... Looking at this in terms of the confusion... To me, it is a broad statement in terms of, give me all this. It wasn't possible to give him the raw data when we came down to it in terms of trying to resolve this. And when we talk about the confusion and ambiguity, there really wasn't that confusing or ambiguous to the authorities that had previously been asked to do this, and then came back again and did this request. The district court correctly found that this was an appropriate way of responding to this. And then, only after the statistics, he came back and he said, well, these don't quite match my expectations. Did he say he'd blow up the whole thing and say, well, now I want emails, now I want other reports, now I want you to go search all of the emails? If he wants that, he can do that. He can ask for that in a separate request. That is not how he defined documents in this original request, and that's not how he did it. And to sit there and to say, okay, now in a third set of correspondence, now because you ran a couple of tables that you really didn't have to do, now we're this far down the road, now because this isn't quite working out the way I want it, now I want emails and all of that information. And that information, only in that context did they say, well, you're going to ask for emails, you're going to ask for these other documents. That isn't going to get you where you want to go in terms of figuring out, are we giving out the 85,000 numbers and how that's being done in terms of what those applications are, in terms of the numbers of applications received and the numbers approved and the numbers denied. And what part of FOIA authorizes that kind of response? It requires that they have to have documents. If the document doesn't specify that they want those documents. So is that a denial that the documents exist, or is that just a disagreement with the FOIA applicant that the documents will answer what he's inquiring about? If he asks for, I want emails and I give a definition and that definition then is presented to the agency and the agency then goes out, analyzes it and responds to it and says, this is what it's going to cost us to go search these people's emails. They could have said that, but that's not what they said. They said supplying you with all this information will create confusion. That's not a basis for denying a FOIA request. I'm out of time, Your Honor. I think that the confusion only came up within that context of trying to say, you want to try to look in terms of having these numbers balanced. That is not going to lead you. You're not going to find somebody's emails to say. And what part of FOIA authorizes that kind of response? I think it wasn't really the response itself. I think it was an explanation of what he was talking about at that point was something that was beyond the scope of what he asked for originally. So we're denying your request because it would create confusion. I don't believe, Your Honor, if you look at the context of that that we said that we're denying it because it would cause confusion. It was denied in terms of, if his goal was to figure out if we were meeting the requirements of allocating those visas, having the contemporaneous emails of the people that are monitoring the cap at that point are not going to provide any insight into that. And that wasn't really. And what authorizes the agency to make that judgment in response to a broadly framed FOIA request? I don't think that was the basis that she, I think she was trying to explain it and not doing it. I think it was because it was beyond, that we had no documents that were responded to this request as specifically as it was drawn. You had no emails. You had no internal memoranda. You had no other documents reflecting communications regarding these statistics. No, the emails, there obviously would be emails. I don't know what they are. So what was the basis for not supplying them? The basis was that it was not included within this original response, within the original request. Thank you, Your Honor. Mr. Murdock, you've just got one minute. I just want to make one quick point about the importance of Mr. Rumman's FOIA request. I mean, as Mr. Oswald pointed out, this year, USCIS received 300,000-some petitions for 85,000 visas. But that's not always been the case. And most importantly, it wasn't the case in the fiscal years where Mr. Rumman was seeking information for. In some of those years, they actually received far fewer petitions than the cap within the initial filing period. And the filing period was kept open for several months. So it is important for Mr. Rumman to be able to figure out how they're making these calculations and determine when to close the cap. It is not always the case, and it's not necessarily always going to continue to be the case, that the cap's going to close immediately, because there's going to be three times or four times as many petitions filed as there are visas available. So this continues to be an important issue. Thank you. Thank you. Thanks to both counsel. The case is taken under advice.